Good morning, and may it please the Court. Stephen Meyer of Charlotte, on behalf of the Appellant Defendant, Leonard Bernard. Mr. Meyer, I have a question for you at the very outset. Yes, Your Honor. You filed an Andrews brief, right? Yes, Your Honor. And then this Court issued an order asking you to file a supplemental brief addressing two issues. And one of those issues, whether the district court, I'm reading from the order, whether the district court erred in concluding that your client consented to the search of the cargo on top of his vehicle. You did not even address that issue in your supplemental brief, did you? Your Honor, I felt that looking at Judge Voorhees' order, I thought that was interpreted, the question, as looking at his order, and he specifically referred to voluntary consent. Uh-huh. And that voluntary consent, I felt, was appropriately analyzed under DiGiovanni, ultimately then Rodriguez, and his clients. You did read this order, so you do think you addressed the two questions. Is that your position? I did, Your Honor, and I thought that it was a question of voluntariness, whereas perhaps scope is more appropriately, or at least I thought more appropriately, under Neely. So I certainly meant no disrespect in that regard. Often when, if you ever have this happen to you again, often you set forth what the court has ordered you to discuss as the questions that you are going to discuss, and then discuss them. I mean, the government managed to understand what we had asked to be in the supplemental brief. Your Honor. So the order, I don't think, was unclear. I don't think it was unclear, Your Honor. Okay. I was, I was. I understand your position. Thank you, Your Honor. If I may proceed, then. The, in this matter, Defendant Leonard Bernard was stopped in violation of his Fourth Amendment rights. He was held beyond the scope of said stop. His, any subsequent search would have also been violative of his Fourth Amendment rights. And ultimately, when he was Mirandized, and he was searched, and his property without voluntary consent, his Fifth Amendment rights were implicated. And those should also, therefore, then be suppressed. On the morning of December 4th, the North Carolina State Trooper stopped and pulled Leonard Bernard over without reasonable suspicion. Ultimately, only giving him warning. That should have been the end of the encounter, as the scope and purpose of the stop was, in fact, limited. I thought you said it had no purpose at all to stop him. Didn't you say it had no purpose to stop him? I thought I just, what you said. There was no, we're contending that there was no reasonable suspicion to stop, Your Honor. What was the purported reason? He was ultimately given a warning. No, no. What was the purported reason for stopping him? Fatigue and suspicion of DWI, Your Honor. Right, it had nothing to do with the movement of the car. There was several things that were cited in evidence. It was talking about the fluctuation of the speed. And? He didn't cross the incoming lane of traffic, but there was a one-touch line on the fog line on the outside. So there was articulable reason for the stop. You may think they were minor, but there were articulable reasons for the stop, correct? Problem in this case, yes, Your Honor. Okay. The problem in this case, if I may take that one step further, is that when his Honor, Judge Voorhees, reviews the video in this matter, he ultimately says that, you know, it doesn't appear, and I just don't want to, as far as the video is concerned, it was not clear to the court that you could discern any weaving or notable erratic movements in the defendant's car. He concedes it was some distance from the location of the camera, and it wasn't clear that it did not get onto the fog line as testified to by the officer. Your Honors, I fully concede that the reasonable suspicion question is a fairly low bar overall. And not a question that we asked you to address in the supplemental brief, right? Correct, Your Honor. Okay. Would you like to give us argument on the other question that we asked you to address in the supplemental brief? You devoted, I guess you devoted a paragraph to it in your brief. You know what I'm talking about? Your Honor, there was a, there was the issue of the The Innis case, Rhode Island v. Innis, which you did not cite to us. Your Honor. About the statement in the car before he is Mirandized by the police officer. There may be some people that might want to talk to him, and that he might want to think about trying to help himself out. Was that a fund, the question was, was that the fundamental, the functional equivalent of questioning by the police officer pre-Mirandizing? Your Honor, as Your Honor's already noted, he was not Mirandized. He was in custody because he was. Yeah, yeah, yeah, we know that. He was handcuffed at the time. I would say that it was the functional equivalent, and the reason it was the functional equivalent, Your Honor, is because it was reasonably intended or likely to elicit an incriminating response from the defendant. You're not. That's a good argument. Why didn't you make that argument in your brief? I mean, at least it answers the question that was submitted to you in the supplemental order, in the order, asking for supplemental briefing. I apologize if I'm better verbally than in the brief, Your Honor. So, I didn't mean to interrupt your argument. Please. I'll continue on with the innocent question, Your Honor. The, I believe the key here, and I'm ultimately falling back on Miranda, Your Honor, and I quote, in order to render a statement admissible, the proof must be sufficient to establish that the making of the statement was voluntary. That is, from the causes, which the law treats as legally sufficient to engender in the mind of the accused hope or fear. In respect to the crime charge, the accused was not involuntarily impelled to make a statement, when, but for the improper influences, he would have remained silent. Your Honor, Your Honors, in this case, what's key here is that Trooper Willis ultimately says, there's some people that might want to talk to you, and it may help you, it might help your case. That alone, that it might help your case, is a question of, I would say, really hope, because he's saying it might help your case. It goes directly to the question of, the question of coercion, especially when it's incommunicado, as Miranda addresses. The fact is, Your Honor, How do you distinguish McGinnis? McGinnis, if you remember, they had a conversation about trying to find guns, or the observation that somebody could get hurt while in the car, driving a man in custody, and he responds and tells them where the guns are. And the Supreme Court held that was not coerced. Your Honor, just so I can make sure I'm answering Your Honor's question, you said Innis, correct? McGinnis. The Supreme Court case. Or Innis, or is it Innis? Innis. I think the facts refer to Innis, if I'm... Yeah, Innis, right, I'm sorry. Your Honor, there's several things that distinguish Innis. The first is that it's absolutely true, the officers were talking with each other. And so the court essentially rules that it couldn't, at least on paper, I think was the reference, but at least on paper... In Innis they were, in the Supreme Court case, is that what you're saying? Yes, Your Honor. Okay. They were talking with each other, and it could not have been reasonably calculated that it would have caused an incriminating response in and of itself. They couldn't have known that the defendant in that case was subject to bouts of conscience, let's say. The second part about Innis is that he was, in fact, I'm sorry, Mirandized. He was, in fact, Mirandized, and if I'm not mistaken, several times, in fact. And ultimately, when he was Mirandized, he was, when he gave the statement, the officer in charge sits him down and says, now look, before we go any further, let me make sure you get Mirandized again. I would say in Innis they went greatly out of their way in doing so, Your Honor. Lastly, in Innis, I would contend that they already have, they've gone way beyond what they would normally need in terms of perhaps the scope of establishing probable cause in that case. Ours, I would contend, was reasonable suspicion up until he eventually gets arrested. Your Honors. You don't have to use up all your time, but you can. Thank you, Your Honor. I would cede my time, then. Thank you. Thank you. Ms. Wray. May it please the Court. The district court did not clearly err when the court found that Mr. Bernard voluntarily consented to the luggage, to the search of not only the contents of the vehicle, but also the contents of luggage. That's what the consent to search form said, and the court did not clearly err. Did he sign a form? He did sign a form, and, Your Honor, I submitted that in the supplemental joint appendix. Yes, I know. I do remember that. Thank you. And it specifically said, including the luggage and all contents therein. And he signed the form before the search? He did. Yeah, okay. He did. And in writing, consented to that search. And the government's position is that the district court properly found that the scope of the search, having included luggage and all contents therein, would include the luggage, the contents of what's on top of the car. I would suggest that it would also include what would be on the back of, you know, one of those luggage carriers that you put on the hitch, for example. In Flores, this court held that it included the search of the trailer when someone agreed to consent to the search of the car, when Mr. Flores did in that case. So the district court, and it's a clear error of standard of review in terms of the scope of the search, so the district court did not clearly err. So maybe talk to us about the in this issue. Headed that direction right now, Your Honor. Okay. In terms of the interrogation, the question is whether the coercion was akin to a custodial interrogation. So the standard requires not only that there be custody, but that there be a similar coercive effect. And I note that here, it's a declarative statement. It's that there might be some people who want to talk to you when we get to the detention center, and you may want to talk to them. There was, was that reasonably likely to elicit an incriminating response? To help yourself out. Right. You may, and he did, by the way, say, you're in a little bit of trouble. When you get there, you may want to help yourself out. But he didn't say anything that I think would reasonably, I think the district court was right, that would be reasonably likely to elicit an incriminating response. In a couple of similar cases, for example, in Blake, this court held that presenting a defendant with charges and saying, bet you want to talk now, huh? That wasn't enough. And in, I think it was Pratt, because in that statement, it didn't suggest what might be the outcome of talking. Just, I bet you want to talk now. But here, it says, you help yourself, to help yourself. Yes, but in Blake, the court said it's not enough for the statement to tighten the screws so that a defendant might cooperate. Or so that, you know, so to at least implicitly suggest, and in Blake, the court noted that the statement that, guess you want to cooperate now, was an implicit suggestion that cooperating would benefit the defendant. Well, it seemed to me that when I was reading the Innis cases, there are a lot of them in the Supreme Court, and then cases that followed it, that foreseeability is central to the Innis discussion. That's what the Supreme Court talked about. It's reasonably foreseeable to elicit an incriminating response. Bernard had already incriminated himself post-arrest, right? I mean, he seems to be talking nonstop. And given all the circumstances, he's in the car with the police officer who has established a relationship with him. Wasn't it foreseeable that telling Bernard that he was going to the detention center and should think about cooperating to help himself out would elicit a self-incriminating statement? Judge Monson, honestly, I don't think so. Not to Willis. It would be foreseeable, perhaps, that he would there. Presumably, after he — I'm sorry. I didn't understand the question. To the officer in the car, I would say no. No, but we're looking at it from, you know, 700 feet, and we're looking at sort of what this would be. Okay, I hear what you're saying. Yeah, I guess what I'm saying is that he's saying, look, when you get there, you might want to talk. And you might want to say something. At that point, he would have had — I don't think he said, when you get there. — Mirandized. No, but they were on their way. Well, he does say — There may be some people that might want to talk to you. Right. And then he might want to think about trying to help himself out. Right. You may want to talk to them. I don't think you get a pass on that, Ms. Ray, because that's saying, well, we did something that gave him hope, but we didn't know he was going to do that right then. But it's the same effect. If he had said the same thing to them, the point is, you know, you have to take it as it is. If you give hope that is suggestive, that somehow interrupts voluntariness, then I don't think you get a safe harbor by saying, well, we thought it would make him do that, but we thought he would have waited until he got to the station. It's because he did it earlier. Oh, I don't think that would be the case, is it? Judge Gregory, I only mean to say that what he was referring to was that you might want to talk later. The implication was you might want to talk when you get to the detention center. There might be some people that want to talk to you. I think what makes this a little dicey for me is because he's given all of these statements that the government doesn't rely on. It needs to rely, or it's very helpful to the government because he actually has a defense here. Or he proposed a defense that he was using this because it was medical marijuana. And so the statements that he made in the car, whether they were precipitated in violation of the Constitution or not, those statements are very helpful to the government's case on that issue because he has — I mean, the government might have prevailed anyway. But it's an — and I don't think — I read the transcript. I don't think that the whole idea that this was medical marijuana — I think that was something that was a surprise to the prosecutor. And so — and they might have been better prepared for it, you know. But they had this statement to go with. Right. To argue against that. Yes. And I — that actually — the medical marijuana issue was the subject of a grand jury appeal earlier, so I'm going to leave that to the side. Right, right. I'm not — And I just mean — You're sort of trying to lay the table on why I think that this is — because he made — Yes. — all — you know, there's all the massive amounts of evidence, so there wasn't an asserted defense. Well, he was all along asserting — well, in court, at least — that his defense was that it was for his personal use. Now, I do — So can I ask you a question about that? Yes. This is a massive amount of drugs. Fifty-three jars. Mason jars. A massive amount of drugs if it's being used for personal use. So isn't there — doesn't the government have a harmless error argument, even if there's a constitutional violation? We made it. Yes, Your Honor. I've made the harmless error argument. I think that it would be harmless even if this court held that the statement was improperly admitted. But I — and — How big were the mason jars? Well, the total amount was one and a half kilograms, and there were 53 mason jars. I think they were court-size, if I'm not mistaken. Do you — can you refer me to anything that tells me what is standard — this shows you how naive I am — what would be normal use — One mason jar a month. Right. I mean — Is that what you say? Yeah. One mason jar a month. I can't, Your Honor. I don't have — Okay. A week. I will — well, I don't want to be flipped. No, no. I'm not asking you to be flipped. I'm actually actually — I live in Asheville, so one might know, but I don't. No, that's fine if you don't know. I thought you might have some authority. What I do want to take the court back to, though, is that you have to — the interrogation, it's not just a question. It is — the ultimate issue is, is it reasonably likely to incriminate — elicit an incriminating response? But it also has to be coercive to hand out to an incustodial — in a regular custodial interrogation. Right, but we know from innocent it doesn't have to be coercive in the sense of beating somebody up or even asking questions. Right, but — Statements can be regarded as coercive. Similar to a coercive — the same kind of — it's not enough that he was in custody. That's what we know. It's not — just the fact that he was in custody doesn't mean that it was an interrogation in violation of Miranda. What — or that it would have to be suppressed. What we — what it says is it has to be similar to the kind of coercive — the coercive context. And the fact that this gentleman was — that they had developed a rapport, I would suggest remove some of that coercion. I'm sorry. That they had developed a rapport. That I don't think that there would be — Well, I don't — I think that sort of goes both ways. I agree. I think it could, but I think the district court could conclude that it was not as coercive. It was a declarative statement. It wasn't a question. It was a declarative statement made about a future event, which presumably he would have been Mirandized by the time he did it. And it was a statement made in the context of a relatively friendly encounter from all that I could tell. It appeared to have been a friendly encounter. And so I think that those three factors take it outside, particularly when this court considers its earlier decisions in Payne and in — what was the other one? Blake. I think that both of those cases involved more coercive statements or more — statements that were more likely to elicit an incriminating response than the statement in this case, that, you know, you're in some trouble. You get there. Some people might want to talk to you, and you may want to talk to them to help yourself out. So I think that it is less incriminated — less likely to elicit an incriminating response. It is not — subtle compulsion is not enough. This court has held that in bell. And I don't think that this was the functional equivalent to an interrogation in a police context for those reasons. This raises two sides. One's fear. The other one is hope. If it's hope, then it normally doesn't come with that heavy hand intimidation. It's just the opposite. You know, it's the good guy, good cop, bad cop type syndrome. It comes with that sort of — as you said, he had developed a rapport. That's what you — you're right. That's the way it starts for hope. Fear is the other way. You know, I'm a bad person. You know, I'm tough. But hope is that, you know, we've talked. And, you know, some people down there, when you get down there, want to talk to you. You may want — you want to help yourself out and talk to them. Well, for what it's worth, Judge Gregory — and I don't know whether you'll consider it's worth much or not — it didn't come across to Bernard as offering him any hope. Because he said, well, you know, I grew it. I'm going to sell it. Nobody can help me out. That's what he said. He didn't consider that kind. Because he knew the fact. He did. But I'm saying he didn't interpret the — he didn't interpret the statement by Officer Willis to be eliciting some hopeful response from him. And I don't think that that's — But the hope is confession. Yeah. Sure. Right. That's what I'm saying, is that the hope is that — not that they're going to say, go and sin no more. But somehow, if I just come clean, it's going to be helpful to me. So that's — but it's not inconsistent. The report that was developed was — you know, you can look at that both ways. I take your point. I understand that in — you know, but I don't think — I still think that if your honors review the case law, there's nothing that I've seen in this Court's decisions or the Supreme Court that suggests that there can be really an absence of compulsion. In here, there wasn't — Do we have any cases, or does the Supreme Court have any cases where the expectation or the hope gave rise to what is necessary coercion? Not that I have seen. Miranda mentions it. The Supreme Court says, you know, it's — Yeah, Miranda does. But I'm talking about the — It talks about it. No. Innis type of coercion. Not that I have seen, Your Honor. You know, I didn't specifically do a search targeted to that, but I have not seen any in which it was sort of, hey, this is a good idea and that that is what yielded a statement that was then suppressed because it was involuntary under Miranda. That's a good point, but we do know that hope does exist as a way that it can be suborned voluntarily and stuff, even though we don't have case law examples, right? Well, there's a sort of a ream of cases that are pretty close to this one from other circuits that talk about a similar situation. Statement that cooperation would be brought to the U.S. Attorney's Office was interrogation. Statement that the officer would inform the district attorney was interrogation. It's telling this defendant last chance to cooperate constituted interrogation. And the difference there, though, is that here where it's all — first of all, it's all in the sort of maybe. You might see some people. They might want to talk to you. That's really very different from I'm telling them what I'm going to talk to the U.S. attorney or the district attorney and let them know what happened here. That's really not as coercive. And I just — I do think that, yes, the Supreme Court in Miranda references hope. But what animates the decision in Miranda and what animated the Supreme Court's decision in Ennis that that questioning was not sufficiently coercive was coercion. The whole — the primary concern that animates this — this — Miranda and also all of the jurisprudence that flowed from Miranda is coercion. It's not, with all due respect, hope. The court mentions hope, but I don't think that I've ever seen a case that that hope is what actually drove the — drove the train. No, no, that's not — Particularly — sorry, Your Honor. Analytically, no. The point is — I agree with the point is that this, that ultimately coerciveness is the catalyst or the active ingredient, but it can be accomplished with hope. You see, you can have so much hope that, unfortunately, in society, many times hope is more destructive than fear because it's the hope that you'll be a star. It's a hope that you'll get rich. They become, at some point, as coercive as the fear of saying, if you don't do it, I'll do this to you. So, you're right. It has to be coercive, but that coercive result can be met — needed. I — or the — the medium of it is through hope. And that is — I got some — people going to be down there. I mean, that's not far-fetched when you know that. He — I mean — I mean, please tell you, listen, when you get down there, there's going to be some people who want to talk to you. I don't think you'll say, well, I wonder, does he really — that may not be people down there. He's just saying that. No, you would think, no, there will be people because I've probably seen these people all the time who meet you when you come down there. And when you get them — then when you get down there, you know, you might want to talk to them, you know, to help yourself. Right. And so, if that becomes such that — that becomes coercive to the wanting to confess, it can be accomplished by — it won't be — and Judge Monson just laid out other cases from other circuits. But so, that becomes the question. It's so coercive. It doesn't mean, ultimately, there has to be something negatively — negative. I — I don't disagree with Your Honor, but I think that — You've agreed earlier that it can be affirmed. It doesn't have to be negative. No, I — And this is, I think, a corollary of that. And I don't know that you disagree with that. I don't disagree with that. I think the question is, where's the line drawn? Yeah, right. And I don't think that the line is drawn at a statement that says, you know, there might be some people that want to talk to you. You might want to help yourself out. That doesn't get there. Now, if it were hope that were more concrete, that were — that was a longer conversation, that went through maybe multiple statements that suggested that he sure better — you know, we might get there. I don't think that this one statement by Officer Willis — or Trooper Willis really gets us there. And I don't think the district court erred in holding that it doesn't get us there. So that's, I think, the best — that's my response. And I would also say that I think fear is a lot more destructive than hope. But I do agree that, you know, at the end of the day, the question is really where the line is drawn. And I don't know of any cases where the line is drawn at a statement quite like this. Well, you know, it's interesting that we'll have a discussion later about hope and fear. But I think I could show you the history of the world, that giving people false hope had been much more destructive than the fear. Because the fear results a lot to people resisting and fighting for themselves. Hope allows people to become complicit in their own destruction. But we could — that's a philosophical argument. We'll take it up later. It would be interesting to do so, Judge Gregory. Absolutely. Absolutely. The government respectfully requests this court affirm the judgment of the district court. Thank you. Thank you, counsel. And, Mr. Maher, you have some time reserved. Thank you, Your Honor. If I may just address further that issue of hope, Your Honor. In the plea transcripts in federal court, the plea in Rule 11, one of the questions, of course, then is, has anyone promised you any leniency or life sentence to get you to induce you to plead guilty? I think it's very much an important part of what motivates people. Is it — in sales, you might call it fear or greed. This is fear or the greed, the hope that you might get out of this somehow. And I think that is a big motivator. Your Honor, on the issue of the amount of marijuana, it was actually, as an aside, in Mr. Bernard's testimony, he talks about the amount and why he needed that. It's essentially — I believe it was Officer — Trooper Willis referenced Cush. It was a fairly high — I'm sorry, I can't hear you. It was referenced as Cush, a relatively high grade. He called it medical marijuana because he doesn't sit there and just smoke, say, a joint or something to that effect. He puts it in a milk or a tea. Right. And he testified that it required approximately a quarter ounce at a time to do this and didn't necessarily give him any sort of mental high or hallucinatory effect. It was really more of an all-over body ameliorative, in essence. So, yes, it is basically what would be typically considered a high amount. But he also uses quite a bit at a time. Most normal usage wouldn't use a quarter ounce of it at a time to use this. So, theoretically, if you were doing that every day, I don't know how much fits in a mason jar, but I think it's probably the actual plant or bud itself. But you don't have any statistics to offer us about this. All I have — About what — I'm sorry? All I have is the testimony, Your Honor. Okay. Thank you. Your Honor, the coercion question is important here. And I appreciate the opportunity to speak to it because here he was seized beyond what DiGiovanni would normally allow and Rodriguez would normally allow. And I think that that combination with the incommunicado communication he was already patted down, although agreed that it was probably appropriate pat down. He's sitting in the police car. I think all of that goes to that question of coercion. It's hard to distinguish when you're a defendant who law enforcement is. There's some people that would like to talk to you. And I don't know that that does anything to say, well, this trooper or maybe a federal agent or — we don't know. But what it does do is it requires reflection. And that reflection goes directly to the question of whether it would be likely to impel an incriminating response of some kind. So — Is he out of prison now? He is, Your Honor. Yeah. Going back briefly to the question of DiGiovanni, it's an important case ultimately also because, interestingly enough, he also, in DiGiovanni, gave written consent. He was free to go. And that, in and of itself, was not either sufficient to establish the consent was voluntary or the free to go was not dispositive otherwise. And taken into total account and certainly nearly ultimately, I would say that it was beyond what would normally be considered able to be voluntary per his honor's decision. Unless Your Honors have any further questions, I will thank you for your time. Thank you so much, counsel. All right.
judges: Roger L. Gregory, Paul V. Niemeyer, Diana Gribbon Motz